# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**VICTOR HUBBERT,**

      **Plaintiff,**

      **v.**                                     **Case No. 22-CV-1069**

**KILOLO KIJAKAZI,**
**Acting Commissioner of Social Security,**

      **Defendant.**

## DECISION AND ORDER

Victor Hubbert seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying his claim for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 405(g). For the reasons explained below, the Commissioner's decision is affirmed, and the case is dismissed.

## BACKGROUND

On May 7, 2019, Hubbert filed an application for supplemental security income, alleging disability beginning on May 1, 2018 (Tr. 330) due to post-traumatic stress disorder, hypertension, left eye prosthetic, glaucoma of the right eye, hypercholesterolemia, diabetes mellitus, and hepatitis C (Tr. 334). Hubbert's claim was denied initially on December 17, 2019, and upon reconsideration on May 20, 2020. (Tr. 13.) Hubbert filed a request for a hearing, and hearings were held before an Administrative Law Judge ("ALJ") on June 11, 2021 and on November 1, 2021. (Tr. 31–47, 48–86) Hubbert testified at the hearings, as did Kari Seaver, an independent vocational expert ("VE"), at the June hearing and VE Jacquelyn

Wenkman at the November hearing. (*Id.*) Hubbert was represented by Attorney Jennifer Morgan at both hearings. (*Id.*)

In a written decision issued December 10, 2021, the ALJ found that Hubbert had the severe impairments of: depression disorder; anxiety disorder; substance abuse disorder; personality disorder; schizoaffective disorder; and a left eye prosthesis. (Tr. 16.) The ALJ found that Hubbert did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). (Tr. 16–18.) The ALJ further found that Hubbert had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following non-exertional limitations: limited to understanding, carrying out, and remembering no more than simple instructions; limited to simple tasks; have no interaction with the public and only occasional interaction with supervisors and co-workers with no tandem tasks; and is further limited in that he has vision in only one eye. (Tr. 18.)

The ALJ found that Hubbert had no past relevant work; however, the ALJ determined that based on Hubbert's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that he could perform. (Tr. 23–24.) Thus, the ALJ found that Hubbert was not disabled since May 7, 2019, the date of the application. (Tr. 24–25.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Hubbert's request for review on July 21, 2022. (Tr. 1–5.)

## DISCUSSION

*1.    Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal

standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

   2.   *Medical Evidence*

Hubbert challenges the ALJ's findings regarding his mental impairments; thus, I will focus on these records.

Hubbert was fifty-three years old when he applied for SSI on May 7, 2019 (DOB July 31, 1965). Hubbert has a long history of depression and sleep disturbance (Tr. 597) and reported experiencing visual and auditory hallucinations, specifically of deceased family

members, since the age of thirteen when his father died (Tr. 558). In 1989, when he was approximately twenty-four years old, Hubbert attempted to overdose on cocaine. (Tr. 597.)

The record indicates that Hubbert has not been out of prison for a full year since 1996 (when he would have been approximately thirty-one years old) and has supported himself by breaking and entering and stealing scrap metal. (Tr. 688.) Hubbert was incarcerated throughout most of the relevant time period. In March 2017, Hubbert was transferred from the Milwaukee County Jail, where he had been on suicide watch (Tr. 597), to the Milwaukee Secure Detention Facility ("MSDF") (Tr. 597–99). Upon intake examination, Hubbert reported his current medications were prescribed during his last incarceration in 2016 and that he had been receiving counseling through the Rescue Lodge located at 6th and Walnut in Milwaukee. (Tr. 598.) Regarding the recent suicide watch, Hubbert stated that at the time he felt like giving up, that he has nothing, has little support, and is dealing with homelessness. (*Id.*) While at the MSDF, Hubbert treated with various providers. In April 2017, Hubbert's mood and affect were dysphoric and anxious and his thinking was ruminative. (Tr. 669.) In May, Hubbert "repeatedly stated he needs help to change his pattern of reincarceration" and stated that he "has held jobs both in prison and community, and can be successful until he loses transitional living." (Tr. 668.) Hubbert expressed feelings of helplessness, hopelessness, and passive suicidal ideation. (*Id.*)

In July 2017, Hubbert treated with Dr. Marcelo Castillo at the MSDF. (Tr. 644.) Hubbert stated that after his hydroxyzine was increased at the May appointment his insomnia had improved. (*Id.*) Dr. Castillo found Hubbert clear of any obvious acute disturbances in orientation, speech, mood, affect, thought process, thought content, cognition, or memory. (*Id.*) Hubbert was diagnosed with antisocial personality disorder, insomnia, and

4

polysubstance dependence. (*Id.*) In August, Hubbert treated with psychologist Dr. Samantha Lavarda. (Tr. 667.) Hubbert reported a childhood friend recently passed away and that he felt as if he was losing all his supports. (*Id.*) Hubbert was tearful, stated he had limited coping abilities, and that he often felt like giving up. (*Id.*) In September, Hubbert was transferred from the MSDF to the Racine Correctional Institution ("Racine"). (Tr. 664.) Hubbert reported to Lawrence Todryk, PsyD that he was depressed nearly every day for most of the day and he had diminished interest in all or almost all past pleasurable activities. (*Id.*) Hubbert reported significant weight loss, insomnia, fatigue, feelings of worthlessness and hopelessness, diminished ability to think or concentrate, and recurrent thoughts of death. (*Id.*) Upon examination, Dr. Todryk noted that Hubbert's mood was depressed, and his affect constricted, but his short and long-term memory appeared intact. (*Id.*) His thought process had themes of hopelessness and helplessness, but he appeared to be stable. (*Id.*) Dr. Todryk's impression was that Hubbert presented as severely depressed with melancholic features. (*Id.*)

In October 2017, Hubbert began treating with psychiatrist Dr. Jim Chen at Racine. (Tr. 643.) Dr. Chen noted that Hubbert complained of chronic insomnia, depression, and nightmares, and since 2008, hearing voices of his deceased grandmother, aunt, and mother. (*Id.*) Upon examination, Dr. Chen noted Hubbert was cooperative with fair eye contact, but that his mood was anxious and mildly depressed, and his speech was pressured and tangential at times. (*Id.*) Dr. Chen diagnosed Hubbert with alcohol and cocaine use disorder and rule out post-traumatic stress disorder. (*Id.*) He was prescribed 50 mg of hydroxyzine and 1 mg of prazosin. (*Id.*)

In early November, Dr. Chen noted that Hubbert was "not happy," still had nightmares, and did not sleep well. (Tr. 641.) His roommate told him that he was howling

restless at nighttime. (*Id.*) Dr. Chen noted on examination that Hubbert's mood was anxious, but otherwise his mental status was normal. (*Id.*) In late November, Dr. Chen noted "really no improvement," that Hubbert was "unhappy with everything," and that Hubbert complained about everything. (Tr. 640.)

In early December, Dr. Chen noted that Hubbert was doing much better than at his appointment two weeks prior. (Tr. 639.) He "actually offered no complaint at all, which is totally different than last visit." (*Id.*) Hubbert stated he was not bothered by nightmares and got a job working in the kitchen that he was happy with. (*Id.*) While his mood was mildly anxious, he was not irritable. (*Id.*) On January 3, 2018, Dr. Chen noted that Hubbert continued to work in the kitchen. His hydroxyzine was discontinued and replaced with mirtazapine. (Tr. 638.) On January 31, however, Dr. Chen reported that Hubbert was "not doing well." (Tr. 637.) While he continued to work in the kitchen, he was having trouble sleeping and felt very nervous. (*Id.*)

In February, Hubbert reported continued nightmares and anxiety to Dr. Chen. (Tr. 636.) His prazosin and fluoxetine medications were increased. (*Id.*) In April, Dr. Chen noted Hubbert was "very disturbed by multiple problems." (Tr. 634.) Hubbert was bothered by physical ailments but was also experiencing nightmares and hallucinations. (*Id.*) His stepsister recently passed away and Hubbert was experiencing auditory and visual hallucinations that he was very disturbed by. (*Id.*) Hubbert's medications now include Haldol along with prazosin, fluoxetine, and mirtazapine. (*Id.*) On May 9, 2018, Dr. Chen noted that Hubbert was not given the Haldol, so he continued to complain of nightmares and hallucinations. (Tr. 633.) On May 25, Dr. Chen noted that Hubbert had received the Haldol less than a week prior, so he had not yet seen any improvement. (Tr. 632.)

In June, Dr. Chen stated that Hubbert had no significant improvement, continued to experience insomnia, and was feeling "too nervous." (Tr. 631.) After missing his July appointment (Tr. 562), Hubbert treated with Dr. Chen again on August 3, 2018 (Tr. 561). Hubbert continued to report nightly nightmares, but denied hallucinations; thus, Dr. Chen noted he was "somewhat improved." (*Id.*) On August 29, Hubbert reported to Dr. Chen that he was happy with his medications, that he was no longer bothered by nightmares, was free of hallucinations, and slept about nine hours in twenty-four hours. (Tr. 560.) Dr. Chen noted that Hubbert's mandatory release date was August 31, 2019 and that he was scheduled to be transferred to the Wisconsin Resource Center ("WRC") in January 2019. (*Id.*) Dr. Chen concluded that Hubbert was responding well to treatment. (*Id.*)

In September, Dr. Todryk noted that Hubbert was referred to group therapy for depression and anxiety. (Tr. 601.) Hubbert presented as "depressed and stable." (*Id.*) Later that month, Dr. Chen reported that Hubbert was no longer bothered by nightmares, hallucinated "every now and then," including seeing his deceased mother the previous night, and slept during the day instead of at night. (Tr. 559.) In October, Dr. Chen noted that Hubbert continued to be free of nightmares but was also continuing to sleep during the day instead of at night. (Tr. 558.) Dr. Chen reported his condition as "stable." (*Id.*) In November, Hubbert reported to Dr. Chen that he was no longer bothered by nightmares and hallucinations, that he was taking part in the stress and anger management groups, and that he slept during the day and night because he had nothing to do. (Tr. 557.) His condition continued to be reported as "stable." (*Id.*) Hubbert treated with Dr. Chen again on December 21, 2018 and February 4, 2019. (Tr. 555, 556.) Hubbert continued to report no nightmares or

hallucinations and exhibited only a mildly anxious mood. (*Id.*) Dr. Chen concluded that Hubbert responded very well to treatment. (*Id.*)

On February 14, 2019, Hubbert was referred to the WRC to participate in the pre-release program and possible substance use disorder treatment. (Tr. 551–52.) Upon mental status examination at intake, nurse practitioner Judith Roberts noted that Hubbert's auditory hallucinations stopped after beginning Haldol, that his mood was depressed, and his affect was guarded; however, his memory was good, his thought process was linear, his insight was fair, and his intelligence was average. (Tr. 554.) While Hubbert's mood was guarded, NP Roberts concluded that Hubbert "[did] not present with any severe signs or symptoms that would indicate psychosis, mood instability, or thought disorder." (*Id.*) Hubbert was continued on the medications prescribed at his prior facility. (*Id.*)

On February 19, 2019, Hubbert treated with NP Roberts. (Tr. 551.) Hubbert reported that he was "doing all right," was able to fall asleep and stay asleep, that he had adjusted well to the unit, and that he tried to interact with other people. (*Id.*) Upon examination, Hubbert's affect was euthymic, his memory was good "as [Hubbert] is able to recall details of conversations he had with this provider in the recent past," and his thought process was linear and goal directed. (*Id.*) In March, NP Roberts noted that Hubbert continued to do "all right," was taking his medications, but was trying to keep to himself since he saw other peers in the unit having conflicts with each other. (Tr. 549.) Hubbert's mood was euthymic. (Tr. 550.) On April 1, Hubbert reported to NP Roberts that his mood was "just fine," and he denied any symptoms that would indicate anxiety, depression, mood instability, or psychosis. (Tr. 548.)

On April 10, 2019, NP Roberts, along with a nurse and social worker, completed a "mental impairment medical assessment" form on behalf of Hubbert. (Tr. 542–46.) The

8

providers opined that Hubbert was only slightly limited in his activities of daily living, maintaining social functioning, and in his concentration, persistence, or pace, but found he experienced repeated episodes of deterioration or decompensation. (Tr. 544.) While they found Hubbert "seriously limited but not precluded" in several areas of mental abilities and aptitude needed to work, they did not find him unable to meet competitive standards in any category. (Tr. 545.) They opined that Hubbert would need frequent unscheduled breaks and would miss more than four days of work per month due to "bad days" from his mental impairments. (Tr. 546.)

After his release from the WRC in August 2019, Hubbert continued his mental health treatment, undergoing two new patient intake examinations on October 30, 2019 and on October 31, 2019 with Dr. Marcel Tassara and Dr. Michael J. Ewing, respectively. Hubbert reported to Dr. Tassara that he was living in a rooming house, sharing a two-bedroom apartment. (Tr. 699.) Hubbert was struggling with depression symptoms since his release. (*Id.*) Hubbert stated that he stayed in bed all day, listening to the radio and playing chess on his phone. (*Id.*) Hubbert reported to Dr. Ewing that he was living with a roommate in an apartment and was "staying out of trouble." (Tr. 703.) He had low energy and fatigue, and his affect was sad. (Tr. 704.) On November 6, Dr. Tassara noted that Hubbert continued to struggle with housing, his roommate, and inactivity. (Tr. 706.) While his mood and affect were depressed, Dr. Tassara found his attention and concentration good, his memory intact, and his thought content logical and goal oriented. (*Id.*)

On November 11, 2019, Hubbert underwent a consultative mental status evaluation with Dr. Edward Dow. (Tr. 688–93.) Dr. Dow noted that Hubbert reported symptoms consistent with depression, such as diminished sense of pleasure, social withdrawal, fatigue,

and hopelessness. (Tr. 689.) Hubbert did not report symptoms indicative of a panic disorder or phobia. (*Id.*) Hubbert also reported short-term and long-term memory deficits and concentration issues and had difficulty recalling details from his past. (Tr. 690.) Upon examination, Dr. Dow found that Hubbert's attention and concentration and cognitive functioning were intact, and he was able to recall 3/3 objects immediately upon presentation and 2/3 objects after a five minute delay. (Tr. 691.) His insight was limited and his judgment fair. (Tr. 692.)

Dr. Dow opined that Hubbert would be moderately limited in his ability to understand, remember, or apply complex directions and instructions; use reason and judgment to make work-related decisions; interact adequately with supervisors, co-workers, and the public; sustain an ordinary routine and regular attendance; regulate emotions, control behavior, and maintain well-being; and have an awareness of normal hazards and taking appropriate precautions. (Tr. 692.) He opined Hubbert would be markedly limited in his ability to sustain concentration and perform a task at a consistent pace. (*Id.*) Dr. Dow found Hubbert's prognosis to be "poor" given his mental health issues and his reported inability to stay out of prison for any significant period for the past twenty-three years. (Tr. 693.) Dr. Dow stated that "it is quite possible he will find himself there again." (*Id.*)

On November 20, Hubbert discussed with Dr. Tassara his same struggles from his last appointment, and noted he was continuing to work on developing rapport and playing chess. (Tr. 709.) Dr. Tassara noted Hubbert had a depressed mood and affect, but that his attention and concentration were good, and his memory was intact. (*Id.*) Hubbert treated with Dr. Ewing on November 26 for medication management. (Tr. 712.) He reported feeling tired and dizzy and mostly staying in bed. (*Id.*) Hubbert's mood was listed as "not happy." (*Id.*) On

December 5, Hubbert reported to Dr. Tassara continued struggles with controlling his diabetes and noted his depression symptoms impeded his self-care. (Tr. 715.) Dr. Tassara discussed with Hubbert his plans for housing and employment. (*Id.*) While his mood and affect were depressed, his attention, concentration, and memory were good. (*Id.*) On December 26, Dr. Tassara addressed Hubbert's concerns regarding his roommate, who was keeping him awake with guests and partying, and his behavioral activation around work, housing, and self-care. (Tr. 718.) Once again, Dr. Tassara described Hubbert's mood and affect as depressed, but with normal attention, concentration, and memory. (*Id.*)

On April 17, 2020, State Agency consultant Dr. Deborah Pape completed a Psychiatric Review Technique for Hubbert. (Tr. 111–12.) She opined Hubbert was moderately limited in his ability to understand, remember, or apply information; interact with others; and concentrate, persist, or maintain pace. (Tr. 111.) In assessing his RFC, Dr. Pape opined that Hubbert was moderately limited in the following categories: the ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (Tr. 115.) She opined he was markedly limited in the ability to interact appropriately with the general public. (*Id.*)

*3.*     *Application to this Case*

Hubbert advances two arguments for remand: (1) the ALJ erred in his evaluation of the opinion evidence as to Hubbert's mental impairments and (2) the ALJ erred in his evaluation of Hubbert's subjective reports of symptoms. I will address each argument in turn.

3.1     Evaluation of Mental Impairment Opinion Evidence

Hubbert challenges the ALJ's assessment of the opinion evidence of consultative examiner Dr. Edward Dow, State Agency consultant, Dr. Deborah Pape, and Hubbert's treating nurse practitioner, Judith Roberts. The ALJ found all three of these opinions partially persuasive. (Tr. 21–22.) Specifically, as to Dr. Pape, the ALJ credited her finding that Hubbert could understand, remember, and carry out simple instructions; had the capacity to work at an adequate pace doing simple, repetitive tasks for two hours; should be precluded from work involving direct contact with the general public; and would work best in a job with limited contact with others. (Tr. 22.) The ALJ noted, however, that there appeared to be a typo in Dr. Pape's opinion that Hubbert was "markedly" limited in his ability to interact appropriately with the general public. (*Id.*)

As to NP Roberts, the ALJ credited the opinion that although Hubbert had limitations in his mental abilities and aptitude needed to work, she did not opine that Hubbert would be unable to meet competitive standards. (*Id.*) The ALJ did not credit, however, the opinion that Hubbert would miss more than four days of work per month, noting that this is a work preclusive limitation which is inconsistent with her opinion that Hubbert could still meet competitive standards. (*Id.*) As to Dr. Dow, the ALJ rejected his conclusion that Hubbert's prognosis was poor and that he would be unable to stay out of prison. (*Id.*) He further rejected Dr. Dow's assessment that Hubbert had marked limitations in his ability to sustain

concentration and perform at a consistent pace, finding that this limitation was inconsistent with the mental status examinations in the treatment records showing normal concentration, as well as inconsistent with Dr. Dow's own examination of Hubbert, which showed attention and concentration as grossly intact. (*Id.*) The ALJ credited, however, Dr. Dow's opinion regarding Hubbert's mild to moderate limitations in other areas consistent with his evaluation and the treatment records. (*Id.*)

As to Dr. Pape, Hubbert argues that the ALJ's analysis is "deeply flawed." (Pl.'s Br. at 6.) Interestingly, however, Hubbert does not assert that the ALJ failed to include any relevant limitations in his RFC. Hubbert faults the ALJ for stating that Dr. Pape's finding of a "marked" limitation in interacting with the public was a "typo." He ignores the fact, however, that the ALJ adopted, verbatim, Dr. Pape's opinion that he be precluded from work that involves direct contact with the general public. (Tr. 116.) As stated above, Hubbert's RFC limits him to "no interaction with the public." (Tr. 18.) Hubbert further argues that the ALJ excluded from the RFC Dr. Pape's restriction of limited contact with others. (Pl.'s Br. at 7.) But once again, Hubbert's RFC specifically limits him to only occasional interaction with supervisors and co-workers with no tandem tasks. (Tr. 18.) It is entirely unclear how Hubbert contends this is error.

Hubbert's argument regarding how the ALJ erred in his assessment of NP Roberts' opinion is difficult to follow. (Pl.'s Br. at 7.) It appears he argues the ALJ erred once again in assessing his limitations with social interactions. (*Id.*) But the ALJ *did* credit NP Roberts' opinions regarding his social interaction limitations—she found him only slightly limited in maintaining social functioning (Tr. 544) and "seriously limited but not precluded" in maintaining socially appropriate behavior (Tr. 545). The ALJ determined that these opinions

were consistent with the treatment records and Hubbert's daily activities after release from prison. (Tr. 22.)

Finally, as to Dr. Dow, Hubbert argues the ALJ erred by creating a "false equivalency" between adhering to standards necessary to avoid returning to incarceration and adhering to standards necessary to work. (Pl.'s Br. at 5–6.) But the ALJ did not create any kind of "false equivalency" between staying out of prison and the ability to work, as Hubbert argues. Rather, the ALJ was simply countering Dr. Dow's opinion that Hubbert's prognosis was "poor" and that he was likely going to end up back in prison. (Tr. 693.) Dr. Dow's main support for this "poor" prognosis is Hubbert's "reported inability to stay out of prison for any significant period of time for the past 23 years" (*id.*). However, as the ALJ explained, Dr. Dow's rather negative prognosis was inconsistent with Hubbert's treatment records after his August 2019 release where he was motivated to "stay out of trouble" and seek treatment for his physical and mental ailments. (Tr. 22.) In other words, simply because Hubbert spent significant time in prison does not mean that he is destined to go back. And by the time of the November 2021 administrative hearing, Hubbert had indeed stayed out of prison for over two years.

Hubbert also argues that the ALJ failed to specifically address Dr. Dow's opinion that he was moderately limited in the ability to regulate emotions, control behavior, and maintain well-being. (Pl.'s Reply Br. at 1, Docket # 17.) But the ALJ explained that although Dr. Dow's opinion was not in the most vocationally relevant terms—and this specific opinion particularly fits that description (in what way can he not maintain well-being?)—the ALJ found Dr. Dow's moderate limitations generally consistent with the evaluation and treatment records. (Tr. 22.) Once again, the ALJ limited Hubbert's interactions with co-workers and supervisors and precluded his contact with the general public. (Tr. 18.) Hubbert does not

14

suggest any further limitations required by this moderate limitation in the ability to "regulate emotions, control behavior, and maintain well-being."

The ALJ's assessment of these opinions is well-supported by the substantial evidence. Remand is not warranted on this ground.

### 3.2    Evaluation of Subjective Symptoms

Hubbert argues the ALJ erred in the assessment of his subjective symptoms. (Pl.'s Br. at 8–10.) Specifically, he argues the ALJ improperly relied on clinical exam findings and activities of daily living in discounting his complaints of disabling symptoms. (*Id.*) Subjective statements by claimants as to pain or other symptoms are not alone conclusive evidence of disability and must be supported by other objective evidence. *Grotts v. Kijakazi*, 27 F.4th 1273, 1278–79 (7th Cir. 2022) (citing 42 U.S.C. § 423(d)(5)(A)). The regulations instruct ALJs to consider a number of factors, including: (1) relevant medical evidence, including intensity and limiting effects of symptoms, 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); (2) treatment and efficacy, *id.* §§ 404.1529(c)(3)(iv)-(v), 416.929(c)(3)(iv)-(v); (3) return to gainful activity, *id.* §§ 404.1571, 416.471; (4) work during disability period, *id.*; (5) daily activities, *id.* §§ 404.1529(c)(3)(i), 416.929(c)(3)(i); and (6) statements inconsistent with the record, *id.* §§ 404.1529(c)(4), 416.929(c)(4). An ALJ need not discuss every detail in the record as it relates to every factor. *Grotts*, 27 F.4th at 1278. "Summaries of medical evidence, while definitionally 'partial and selective,' are appropriate." *Id.* However, while ALJs do not need to address every piece of evidence in the record, an ALJ may not ignore an entire line of evidence contrary to its ruling. *Id.*

As to the consideration of Hubbert's daily activities, the ALJ found that after release from prison Hubbert lived in an apartment with a roommate, managed his own home and

medical appointments, and participated in the OARS program.[1] (Tr. 20.) The ALJ acknowledged that the OARS program "seems to be a program that provides some support to inmates after they are released from incarceration." (*Id.*) The ALJ concluded that "even considering these additional supports, [Hubbert] did reasonably well." (*Id.*) The ALJ noted that Hubbert continued not to use substances, followed-up with his providers, had generally normal mental status examinations, and was able to work with his health care providers to better control his medications when he had an abnormal mood. (Tr. 21.) The ALJ concluded that Hubbert's level of functioning was consistent with the RFC finding. (*Id.*)

Hubbert argues the ALJ's discussion of his activities of daily living was deficient. Hubbert specifically takes issue with the ALJ's statement: "even considering these additional supports . . . ." (Pl.'s Reply Br. at 2.) He argues that the ALJ's statement "made it sound like the additional supports would make disability less likely, while the supports should be seen as supporting a finding of disability." (*Id.*) Hubbert argues that the activities the ALJ relies on are of a "simple nature" and even then, he needed supports, thus supporting a finding of disability. (*Id.*)

While a plaintiff's need for additional support to accomplish his activities of daily living may indeed support a finding of disability, Hubbert seems to advocate for a bright-line rule that the use of supports must indicate a finding of disability. That is simply not the case. The ALJ merely acknowledged the fact that despite needing some additional support, which Hubbert obtained through participating in the OARS program, he was still able to do quite a lot on his own, such as manage his household, manage his healthcare, and stay sober. While

---

[1] Opening Avenues to Reentry Success ("OARS") supports the prison to community transition of inmates living with a serious and persistent mental illness who are medium-to-high-risk of reoffending. The program is a collaborative effort of the Department of Corrections and the Department of Health Services. https://www.dhs.wisconsin.gov/oars/index.htm (last visited Aug. 14, 2023).

Hubbert may argue these tasks are of a "simple nature," he seems to underestimate the gravity of these abilities.

Hubbert further challenges the ALJ's reliance on the objective medical findings. The ALJ thoroughly considered Hubbert's mental health treatment notes and found that his symptoms were often well-controlled with medication and therapy. (Tr. 19–20.) The ALJ discusses both periods of increased mental health symptoms, and periods of improvement. (Tr. 20.) In other words, the ALJ did not cherry-pick the record, ignoring an entire line of evidence contrary to his disability finding.

And the record evidence does support the ALJ's finding that Hubbert's mental health symptoms were controlled by medication and therapy. For example, Hubbert was experiencing frequent nightmares and auditory and visual hallucinations while treating with Dr. Chen at Racine. However, just prior to his transfer to the WRC, Dr. Chen noted in February 2019 that Hubbert was no longer bothered by nightmares, was free of hallucinations, and had responded very well to treatment. (Tr. 555) While treating at the WRC, providers noted upon mental status examination that Hubbert's mood was "euthymic," and he was continued on his medications. (Tr. 548, 549.) The ALJ acknowledged that Hubbert reported an increase in symptoms upon release. (Tr. 20.) He also noted, however, that Hubbert's mental status examinations were generally normal, and despite some continued mood abnormalities, he appeared to be doing reasonably well. (*Id.*) Hubbert argues that while the ALJ found that treatment controlled Hubbert's mental health impairments, "the ALJ did not cite evidence showing actual control of symptoms, instead citing only evidence showing effectiveness of medication." (Pl.'s Reply Br. at 2.) Hubbert seems to argue a distinction without a difference—the medication was effective *because* it controlled his symptoms.

Control of symptoms does not necessarily mean the symptoms are completely eliminated. Rather, the ALJ found the evidence supports that with medication, Hubbert is able to perform work within his RFC. The ALJ did not err in his evaluation of Hubbert's subjective symptoms.

## CONCLUSION

Hubbert argues that the ALJ erred in determining that he was not disabled. I find the decision is supported by substantial evidence and affirm. The case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **AFFIRMED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this this 14th day of August, 2023.

BY THE COURT:

NANCY JOSEPH
United States Magistrate Judge

18